[See Case No. 10,185.]

---

## Case No. 8,910.

### McNAMARA v. GAYLORD et al.

[1 Bond. 302.] [1]

Circuit Court, S. D. Ohio. Dec. Term, 1859.

CONTRACTS—EXPONENT OF INTENTION—EXTRINSIC EVIDENCE — SUIT FOR VIOLATION — OFFER TO COMPLY—PARTNERSHIP—SALE OF INTEREST—ADMISSION IN FIRM.

1. A contract free from ambiguity in its terms must be viewed as the exponent of the intention of the parties to it, and can not be varied or contradicted by extrinsic evidence.

2. A partner can not, by an agreement to sell a part of his interest, compel his other partner to accept the vendee as a member of the firm.

3. Where one party to a contract agrees to do an act at a time specified, in consideration of which the other party is to do another act at the same time, neither party can sue for a violation of the agreement, or insist on its specific performance without showing an offer to comply with the agreement, or a sufficient excuse for not doing so.

---

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

In equity.

Charles Fox, for complainant.

Taft & Perry, for defendants.

OPINION OF THE COURT. This is a bill in equity, prosecuted by Thomas McNamara, a citizen of the state of Pennsylvania, against Benjamin B. Gaylord and Thomas G. Gaylord, surviving partners of Thomas G. Gaylord & Co., and Thomas G. Gaylord and E. H. Pendleton, administrators of Thomas G. Gaylord, a former partner in said firm, now deceased. The bill avers, in substance, that in the spring of 1854, after some previous correspondence between the said Thomas G. Gaylord, deceased, and the plaintiff as to the purchase by the latter of an interest in the rolling mill and iron works of Portsmouth, in the state of Ohio, then owned and carried on by Thomas G. Gaylord & Co., on May 10, 1854, a written contract was entered into by which the said Thomas G. Gaylord, Sen., sold to the plaintiff an interest of one undivided eighth in the said mill and works for $15,000, of which $5,000 was to be paid on the 1st of July or October then next, and $2,500 annually thereafter with interest till the whole was paid; and it was also agreed that the plaintiff should take charge of the manufacturing department of the establishment, as manager, at a salary of $1,000 per annum. The plaintiff further avers, that on October 1, 1854, he took possession as a partner and manager, and that he continued as manager until October 1, 1855, and that at that time the profits for the year exceeded $70,000; that in consequence of his objections to certain improvements and additions to the works contemplated by the other parties, from October 1, 1855, he ceased to be the manager and took the place of a shipping clerk, and so continued till September 3, 1856, when he was notified that as he had not fulfilled his contract his connection with the concern must cease; that he left on said 3d of September, at which time the works were stopped to make repairs and improvements. He also avers, that from October 1, 1855, to the date of the stoppage of the works, the profits were $38,664, making an aggregate of profits from October 1, 1854, of upward of $110,000, of which he claims one eighth part, after deducting payments received by him. The plaintiff also alleges that he proposed to and requested of Gaylord, on October 1, 1855, to settle with him, and that the $5,000, which he had agreed to pay, should be retained out of the profits to which he was entitled, which was refused; and he avers that he has been unable to procure a settlement, etc., and he prays for a dissolution of the partnership, an account of profits, and a decree for one-eighth part of such profits.

The exhibits and evidence show that on and prior to October 1, 1854, Thomas G. Gaylord, Sen., was the owner of an interest of three-fourths in the mill and works, and

that Benjamin B. Gaylord owned the other fourth; and that, in the spring of 1855, Thomas G. Gaylord. Sen., sold and transferred to his son, Thomas G. Gaylord, one-half of his interest, to take effect from October 1, 1854. from which date he was therefore a partner. The entire interest was then estimated at $120,000. Benjamin B. Gaylord and Thomas G. Gaylord have filed their answers, as surviving partners; and the administrators of Thomas G. Gaylord, deceased, have also answered. In their answers the administrators refer to and adopt the answer of Thomas G. Gaylord, Sen., filed by him in a suit brought by McNamara in the court of common pleas of Scioto county, Ohio, which involved essentially the matters now in controversy. It is not necessary to notice in detail the numerous allegations of these answers. They deny explicitly that the plaintiff had an interest in the iron works, as a partner, and aver that he has no claim for an account of profits. They insist that the rights of the parties must be settled by the terms of the written contract of May 10, 1854; that the plaintiff failed to comply with his obligation to pay $5.000 on October 1, 1854, which was the condition on which the interest of one-eighth was to vest in him; that he has not paid or offered to pay said sum, nor has he in any way been released from such payment; that he was at no time accepted or treated as a partner, and had no connection with the concern except as manager under the contract, for the first year after its date, and subsequently as a shipping clerk, for which he has been fully paid according to the terms of the contract. There are also averments in the answers to the effect that the plaintiff was incompetent for the discharge of the duties of a manager; and, also, that the contract of May 10, 1854, was entered into by reason of the false and deceptive representations of the plaintiff as to his ability to pay the $5,000, and the other payments specified in the contract, and that he then was and for some time before had been insolvent and wholly unable to meet any pecuniary liability, and therefore that said contract was fraudulent and void.

I do not propose to examine these points in the defense, as there are other grounds which I deem decisive of the merits of this case.

I will not notice the written contract between the plaintiff and Thomas G. Gaylord, premising that it is set forth in the plaintiff's bill in connection with many collateral facts which seem to have no bearing on the merits of this controversy. It is, however, referred to in the bill, as the basis of the plaintiff's claim, as a partner, and his right to an account for profits. The contract is perspicuous and free from ambiguity in its terms, and must be viewed as the exponent of the intention of the parties to it. And as it can not be varied or contradicted by extrinsic evidence. there would seem to be no occasion to notice in this place the correspondence between the parties which preceded its execution. Such a correspondence had taken place, and Gaylord, in one of his letters. stated that the arrangement could not be consummated without the presence of the plaintiff at Portsmouth. He came out, and after an examination of the works, the parties signed the contract. Without reciting it at length, I will state its essential provisions. Its date is May 10, 1854. Gaylord agreed to sell the plaintiff an undivided eighth of the rolling mill and iron works, including everything pertaining to them. except the land, and to give possession the 1st of July or October then next. He also obligated himself to keep a capital of $60,000 in the concern so long as it might be needed, on one-eighth of which the plaintiff was to pay interest and to have one-eighth of the profits, and to share in the same proportion in the losses. The plaintiff was to take charge of the works and manage and superintend the manufacture of iron and nails, for which he was to receive an annual salary of $1,000. He agreed to pay for the interest of one-eighth the sum of $15,000, of which $5,000 was to be paid on the said 1st of July or October. and the rest in annual payments of $2,500, until the whole was paid.

The first remark in relation to this contract is, that it is not by its terms, and does not purport to be, an agreement for a partnership. It is clear that Thomas G. Gaylord could not. by an agreement to sell a part of his interest, compel the other partners to accept the vendee as a member of the firm. It was doubtless intended to be preliminary to such an arrangement, but, per se, can have no such effect. Two objects were within the contemplation of the parties to the contract. It was. in the first place. a conditional sale by Gaylord of an interest of one-eighth in the iron works; and. in the second place. it provided for the employment of the plaintiff as a manager or superintendent at a fixed salary. payable without regard to profit or loss. Under this contract the plaintiff entered on the performance of his duties as manager and superintendent of the manufacturing department on October 1, 1854. It would seem that in the copy of the contract retained by Gaylord. the 1st day of July is named as the time when the plaintiff was to commence as manager, and when the advance payment of $5,000 was to be made; while in the other copy, as already noticed, it is stated in the alternative the 1st of July or October. This difference in the contract is not material, and can not affect the decision of any of the questions arising in this case. As before noticed, the plaintiff commenced his service on the 1st of October. He continued in that capacity until October 1, 1855. By an arrangement then made, he was transferred to. and accepted, the post of shipping clerk, which he held until September 3. 1856. when his connection with the concern finally ceased.

Without noticing the numerous facts brought into this case by the pleadings, exhibits, and evidence, it seems to the court it may be disposed of by ascertaining what are the legal obligations of the parties under the contract in question, and whether the plaintiff has complied with it, in the sense of giving him a right to insist on its strict execution by the other party, and to claim its benefits as if complied with on his part. The terms of the contract have been already stated. As the consideration of the sale by Gaylord of the interest of one-eighth in the iron works, the plaintiff agreed to pay $15,000, of which $5,000 was to be paid October 1, 1854, and the balance in annual installments of $2,500. There is no pretense that the first payment was made on the day named in the contract, or at any time since, or that there has been at any time an offer to pay by the plaintiff, except by a proposition that the profits of the first year should be appropriated as a payment. Now, if this contract had provided only for the payment of the $5,000, without any reference to subsequent payments, I suppose it to be clear the payment of the money, and the transfer of the one-eighth interest, must be regarded as concurrent acts, and that until there was a performance or an offer to perform by one party, the other was under no legal obligation to perform his part of the contract. Where the agreement is to do an act at a time specified, in consideration of which the other party is to do another act at the same time, the party in default can not sue for a violation of the agreement, or insist on its specific performance without showing an offer to comply, or a sufficient excuse for not doing so. By the contract in question the obligation of the plaintiff is not limited to the payment of the $5,000 on October 1, 1854. He was bound to make four other payments of $2,500 each to complete the purchase of the one-eighth interest in the iron works. The contract does not require the vendor to convey to the plaintiff the interest of one-eighth on the payment of the $5,000 in advance; and, by fair legal implication, he was under no obligation to make or tender a conveyance till the whole sum of $15,-000 was paid or tendered. This contract admits of no other construction than that now indicated. And in this view there can be no ground for the claim asserted by the plaintiff, that Gaylord was bound to tender a deed for the one-eighth interest in the iron works on the day named in the contract for the advance payment of $5,000. It is clear, then, that the plaintiff has no ground for the claim that under the contract he is to be regarded as a partner, and entitled to an account for profits. But it is insisted that, irrespective of the contract, the plaintiff has proved facts entitling him in equity to a share of the profits, on the ground that Thomas G. Gaylord, Sen., has waived the performance of the stipulation requiring payment of the purchase money, and that his acts, and the acts of the other members of the firm of Gaylord & Co., show that the plaintiff was recognized and accepted as a partner from October 1, 1854. If this position is sustained by the evidence, it is within the competency of this court, as a court of equity, and it would certainly be its duty, to give the plaintiff the relief sought for by holding him to be a partner, and decreeing a participation in the profits of the firm. I have examined carefully the evidence with a view to this aspect of the case, and without attempting a critical analysis of the facts, will state the conclusions to which I have arrived.

As to the waiver of the first payment required by the contract, there is nothing in the evidence by which it can be established by fair implication. On the other hand, there are several facts and considerations that negative the presumption of such a waiver. That the provision requiring the advance payment was made a part of the contract is a strong presumptive proof that Gaylord viewed it as an essential condition, and expected it would be complied with. There is no reason, from the nature of the transaction, to infer that he was indifferent on this subject. And the correspondence between Gaylord and the plaintiff, subsequently to the date of the contract, so far from showing a purpose or consent to dispense with the payment of the $5,000, proves that it was always insisted on, and referred to, as a condition on which alone the plaintiff could be let into the concern as a partner. It is true, as the evidence conclusively shows, that before and at the date of the contract Gaylord was mistaken as to the pecuniary ability of the plaintiff to make this payment. He had reason to conclude, from his representations on the subject, that the plaintiff had means from which to raise the amount agreed to be paid; and, when he ascertained his inability to do so, he could at once have rescinded the contract. Gaylord did not pursue this cause, but indulged him by an extension of the time of payment, with the expectation that he would be able to procure the money needed. But this indulgence affords no reason for the inference, that he intended to release him from the obligation of his contract, especially as other facts expressly negative any such intention. But upon this point, it is sufficient to remark that at least for the first year of his connection with the iron works, the plaintiff did not pretend to claim an interest in them as a partner, without the payment of the five thousand dollars. That he so regarded the contract appears clearly from the fact, that during that year, as appears from his letters, he was making efforts to raise the money in Pennsylvania. And in one of his letters to Gaylord, he states, in substance, that he did not ask or expect a transfer of the one-eighth interest until the first payment was made.

As a last alternative, he proposed that Gaylord & Co. should receive the remnant of a stock of dry goods, in part payment of the sum due. This was agreed to, on the condition that the goods were suitable for their store at Portsmouth. Upon examination, they were found unsuitable for that purpose, and the negotiation therefore failed. And on this subject it is proper to state, that the plaintiff in his bill avers that in October, 1855, Gaylord claimed that the first payment was due and unpaid, and that unless it was paid the contract would be void, and that plaintiff then proposed that the $5,000 should be credited to him from the profits of the preceding year, which was declined.

But it is insisted by counsel that, conceding the plaintiff was bound to make the first payment, under the contract, on October 1, 1854, and that he has failed to do so, if the evidence shows that he was accepted and treated as a partner, the members of the firm of Gaylord & Co. are estopped from denying the partnership, and are liable to account to the plaintiff for one-eighth of the profits accruing while he was so connected with them.

To appreciate properly the force of this position, it is necessary again to recur to the contract between Gaylord and the plaintiff, and the relation in which the parties stood to each other. Now, if the contract had been merely for the sale of a part of Gaylord's interest in the iron works, without providing for the employment of the plaintiff, as a manager, and he had been permitted to participate in the business of the firm without objection by the old partners, and without insisting on the payment of the purchase money required by the contract, there would be a plausible ground for the claim that these acts were a waiver of the contract, and a virtual recognition of the right of the purchaser as a partner. There are a class of cases in which this principle has been properly applied and enforced; but its application to this case is not perceived. The contract in question provided for the sale of an interest in the iron works to the plaintiff, and also for his employment as a manager. The two objects are divisible; and it is necessary to a right understanding of the intention of the parties that they should be separated. They have no necessary connection with each other. There may have been a failure on the part of the purchaser to comply with his contract, affording a good ground for its rescission, and it may have been in fact rescinded, and yet as to the employment of the plaintiff as a manager, it may have been in full force. There is reason to suppose this state of things was in the contemplation of these parties, in entering into this contract. Gaylord was desirous of securing the services of the plaintiff as a manager, under a belief that he would faithfully and skillfully discharge the duties of the station, and thus promote the interests of the company. He therefore agreed to give him a fair salary, to be paid without regard to the success of the iron works, while he superintended them. In addition to this, he was willing to sell him an eighth interest, at the price and on the condition stated in the contract. The arrangement was obviously a desirable one for the plaintiff, as it secured to him the means of livelihood, beyond all contingencies, with a chance of being interested in the firm on payment of the purchase money. If he failed in making the payments, and thereby forfeited his rights under the contract of sale, he would still occupy his place as manager, and receive his compensation as such.

This view throws light on the true construction of the contract between these parties, and their intention in making it. It also assists in a proper understanding of those acts, which, it is claimed by the plaintiff, are equivalent to a waiver of parts of the contract, and his recognition and acceptance as a partner. It shows, conclusively, that the possession of the plaintiff, so far as he had any, and his participation and agency in the business of the company, did not result from his purchase of an interest in the works, but from the position he occupied under the other branch of the contract, as the manager of the manufacturing department. And hence, the inference is not admissible, that his continuance in the employment of the company, after the failure to make the payment required, and his acts as manager, are evidence of the intention of the other parties to dispense with the obligations of the contract, or that he was accepted as a partner.

But, it is contended by the plaintiff's counsel, that there is affirmative proof that McNamara was treated as a partner during the first year of his connection with the iron works. This is apparent, it is insisted, from the correspondence between him and Gaylord, Sen., subsequent to the date of the contract, and from the verbal statements and admissions of Benjamin B. Gaylord. From a careful examination of the elder Gaylord's letters, I have failed to notice anything that can be fairly construed into an admission that the plaintiff was a partner. On the contrary, he often refers to the contract, and its requirement to pay the $5,000 before the plaintiff can have an interest in the concern. And there are no expressions in the letters from which the inference can be drawn that Gaylord regarded the plaintiff in any other light than a manager. His language is that of an owner to his employe; though he obviously, for a time, contemplated and expected that the plaintiff would make the payment required by the contract, and thus entitle himself to an interest in the iron works. But what seems conclusive on this point is the fact, that at least for the first year there was no semblance of a claim by the plaintiff that he was a partner. In one of his letters,

before referred to, there is an explicit disclaim of any right as a partner, or to a transfer of the one-eighth interest, until the first payment was made.

Nor does the evidence of the acts or declarations of Benjamin B. Gaylord prove the recognition of the plaintiff as a partner. It is true that on several occasions he stated the fact that the plaintiff had purchased an interest in the establishment; and two witnesses testify that after the plaintiff became connected with it, Gaylord introduced him as a partner. It is obvious, however, when this evidence is taken in connection with other facts, that he had reference to the contract between the plaintiff and Thomas G. Gaylord, Sen., and to the expectation that the contract would be consummated, and that the partnership would thus take place. There can be no question that for the first year after the plaintiff began his service as a manager, the Gaylords supposed he was acting in good faith, and had the intention and the ability to comply with his agreement; and their conduct was consistent with this supposition.

It is insisted, also, as a strong proof of the plaintiff's recognition as a partner, that he negotiated a sale of a large quantity of iron to a mercantile house in St. Louis, with the knowledge and approbation of the Gaylords. Without noticing in detail the correspondence between the plaintiff and the St. Louis house, it is sufficient to state that while he intimates that he has an interest in the Portsmouth Iron Works, he does not use the name of the firm, as he properly might do, if a partner, but subscribes the letters T. G. Gaylord & Co., by Thomas McNamara. This fact repels any presumption that might otherwise arise from this transaction that he was a partner.

There is one fact, full of significance as to the understanding of the parties, in regard to the question of partnership. It is in proof, that, in accordance with an established usage of the firm of Gaylord & Co., an account of stock was taken in the beginning of October, 1854, and a few days after the plaintiff had assumed the duties of manager; and that in taking this account no notice was taken of his interest as a partner. It also appears that there was no change in the partnership books, and that no charge was made against the plaintiff as for stock purchased. Nor was any notice given to the public, through the papers or otherwise, of any addition to or change in the membership of the firm. It is incredible that a step of such interest to the parties should take place without being noticed in some or all the ways referred to. And on this question of partnership, it is proper here to notice that the proof is very explicit that Benjamin G. Gaylord often, and in very emphatic terms,

denied the fact of the plaintiff's interest in the concern, and affirmed that his connection with it was exclusively that of a manager. But, without extending my remarks on this point, I may state it as my unhesitating conclusion, that the evidence wholly fails to establish affirmatively that the plaintiff was in fact a partner, or that he was recognized and accepted as such.

There is another aspect of this case, as presented by the plaintiff's bill, to which I will briefly advert. It is claimed, as I understand the allegations of the bill, that apart from the contract, if the court is satisfied the plaintiff has rendered valuable service to the firm of Gaylord & Co., and that during the period of such service large profits were made, he is entitled, on the broad principles of equity, to his proportionate share of such profits, and to a decree that will carry out that object. The basis of this claim is, that although the first payment of $5,000 was not made, the one-eighth of the profits from October, 1854, to October, 1855, were nearly, if not quite, enough to meet that payment, and that the plaintiff was entitled to credit on the contract for his proportion of such profits. He avers in his bill that in October, 1855, he requested a settlement with Gaylord & Co., on this basis, which they refused. It also appears from the plaintiff's letters written in 1855, that this proposition had been a subject of correspondence between him and Gaylord, Sen., and had been uniformly declined by the latter, with a protestation that the plaintiff was not entitled to anything on the ground urged by him.

It is only necessary to say on this point, that this was no part of the contract of the parties. The contract clearly contemplated the payment of the entire amount of $15,000. No principle of equity requires that the profits should be appropriated as claimed by the plaintiff; nor had the proposition a shadow of reason for its support. It was in effect saying, that without the contribution of a dollar to the capital of the firm, and after being paid his salary for his services as a manager, he was still entitled to all the benefits of an actual partner. The equitable phase of this matter would be different, if the plaintiff had devoted his labor and skill for the interests of the firm without any agreement for compensation as manager; but being fully paid for his services in that capacity, no reason is furnished for claiming a share of the profits.

But it is unnecessary to pursue this investigation. And without noticing the other points presented in the case, I have no hesitation in announcing the conclusion, that the plaintiff was not a partner of Gaylord & Co., and is not entitled in equity to an account of profits. The bill must therefore be dismissed.